UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

vs.

Marcus James Neadeau,

        Defendant.        Crim. No. 09-126(01) (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress Evidence Obtained from a Wiretap, and the Defendant's Motion to Suppress Evidence Obtained from Search and Seizure.  A Hearing on the Defendant's Motions was conducted on June 4, 2009, at which time, the Defendant appeared personally, and by Bruce R. Williams, Esq., and the Government appeared by Steven L. Schleicher, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motions to Suppress be denied, in their entirety.

## II. Factual and Procedural Background

The Defendant is charged with one (1) Count of Conspiracy to Distribute and to Possess with Intent to Distribute Cocaine, in the amount of 500 grams or more, and Crack Cocaine, in the amount of five (5) grams or more, in violation of Title 18 U.S.C. §§841(a)(1), 841(b)(1)(B), and 846. The events which give rise to those charges are alleged to have taken place from on or about January of 2009, and continuing through on or about March 15, 2009, in this State and District. As pertinent to the charges, and to the Motions now before us, the operative facts may be briefly summarized.[1]

---

[1]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 U.S. 1228 (1992); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

A.    Facts Regarding the Wiretap.

At the Hearing, the Government adduced the testimony of Timothy Mellor ("Mellor"), who is a Special Agent with the Drug Enforcement Administration ("DEA"), and who was the case agent for a narcotics investigation, which identified the Defendant as a cocaine distributor in Bemidji, Minnesota, and on the Red Lake Indian Reservation ("Red Lake").  According to Mellor, on February 13, 2009, he submitted a Wiretap Application and Affidavit, which were related to a cellular telephone that was being used by the Defendant. See, Government Exhibits 1-2.[2]  In his Affidavit, Mellor attested to his experience and training in narcotics investigations, including the use of wiretaps, and he further attested to his belief that the Defendant, and others, were engaged in narcotics trafficking, and the illegal possession of firearms, and that they were using wire and electronic communications to further their criminal activities. See, Government Exhibit 2, at ¶¶1-6.

In his Affidavit, Mellor averred that, on October 5, 2006, Russ Traurig ("Traurig"), who is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and Robert Woldt ("Woldt"), who is a Special Agent with

---

[2]At the time of the Hearing, Government Exhibits 1 through 13 were admitted into evidence, with no objection by the Defendant.

the Federal Bureau of Investigation ("FBI"), interviewed Gary Strong ("Strong"). Id. at ¶13. During the course of that interview, Strong admitted to trafficking cocaine, in kilogram quantities, from the Minneapolis area to Red Lake, between the Fall of 2005, and the Spring of 2007. Id. Strong also stated that he had occasional contact with the Defendant, during that time period, and that the Defendant once offered to sell cocaine to Strong for $26,000.00 per kilogram. Id.

Mellor further attested that, on November 14, 2006, Traurig interviewed a confidential informant ("CS-1"), who admitted distributing crack cocaine for the Defendant, and his associates, beginning in 2005. Id. at ¶15. During the interview, CS-1 stated that he or she had traveled with the Defendant from Red Lake to Columbia Heights, Minnesota, on seven (7) occasions in 2005, in order to purchase cocaine. Id. On each occasion, the Defendant purchased between two (2) and thirteen (13) ounces of cocaine, at a price of $1,000.00 per ounce although, on one (1) occasion, the Defendant purchased a kilogram of cocaine for $20,000.00. Id. According to CS-1, the cocaine was later converted to crack cocaine in Red Lake. Id.

According to Mellor, on February 11, 2008, CS-1 informed Traurig that Vicki Neadeau was using her residence to sell narcotics on behalf of the Defendant, and that CS-1 had observed sales to thirty (30) to forty (40) people, over a period of three (3)

days, in January of 2008. Id. at ¶17. On February 26, 2008, CS-1 made a controlled purchase of a one-half (½) gram of crack cocaine, at the residence of Vicki Neadeau. Id.

In the interim, on January 17, 2008, a Red Lake police officer contacted Traurig so as to advise that he had interviewed another confidential informant ("CS-2"), who had observed the Defendant with approximately one-half (½) kilogram of cocaine, inside the Defendant's residence. Id. at ¶18. CS-2 also informed the Red Lake police officer that he had seen the Defendant arrange drug transactions through text messaging. Id. Accordingly, on February 21, 2008, Traurig interviewed CS-2, who was then incarcerated. Id. at ¶19. CS-2 reported that he or she has known the Defendant since childhood, and that he or she regularly brokered deals for crack cocaine on behalf of the Defendant and others. Id. CS-2 also corroborated CS-1's statement, that the Defendant uses the residence of Vicki Neadeau to conduct drug sales, and CS-2 stated that he or she had observed approximately forty (40) firearms at Vicki Neadeau's residence. Id.

According to Mellor, on August 18, 2008, Traurig interviewed CS-2 again, with the assistance of Robert Mertz ("Mertz"), who is a Special Agent with the FBI. Id. at ¶20. CS-2 advised that he or she had observed Vernon May ("V. May"), one of the

Defendant's associates, distribute crack cocaine on five (5) occasions, since the end of July of 2008, from a residence in Red Lake, while armed with a 9mm pistol. Id. According to CS-2, the Defendant, and V. May both, indicated that the Defendant was delivering crack cocaine to that residence in "five packs," meaning $500.00 worth of cocaine, packed in ten (10) individual bundles of a one-half (½) gram. Id. In addition, the Defendant advised CS-2 that he travels to the Twin Cities in order to obtain drugs, and CS-2 advised that the Defendant and V. May, along with others, were present at another residence in Red Lake, during the process of cooking powder cocaine into crack cocaine. Id.

According to Mellor, Traurig interviewed CS-2 for a third time on September 2, 2008, with the assistance of Michael Aalto ("Aalto"), who is a Special Agent with the ATF. Id. at ¶21. At that time, CS-2 admitted serving as a broker for drug transactions, on behalf of the Defendant. Id. CS-2 also related the coded language that the Defendant employs to communicate with his associates, when engaged in drug trafficking activities. Id. During the course of his or her interactions with the Defendant, CS-2 advised that the Defendant had used a "bug detector," to ensure that CS-2 was not wearing any recording or transmitting equipment. Id. In addition, CS-2 advised that he or she had purchased firearms from, and sold firearms to, the

Defendant in the past, notwithstanding the Defendant's prior felony conviction. <u>Id.</u> at ¶¶21-22.

On September 4, 2008, CS-2 attempted to arrange a controlled purchase of crack cocaine from the Defendant, by text messaging the Defendant's cellular telephone. <u>Id.</u> at ¶23. However, after CS-2 inadvertently re-sent the original text message three (3) times, the Defendant replied "your cut off Aint fuc'n with yo pest e ass [sic]." <u>Id.</u> Subsequently, on September 10, September 18, and December 10, 2008, CS-2 completed controlled purchases of crack cocaine from the Defendant, and his associate, Jacob Hunter ("Hunter"). <u>Id.</u> at ¶¶24-27. In each instance, CS-2 purchased five (5) grams of crack cocaine, and he or she arranged the transactions through coded text messages with the Defendant, and Hunter. <u>Id.</u>

On December 10, 2008, Traurig interviewed CS-1, with the assistance of Corbin House ("House"), who is an investigator with the Red Lake Public Safety Department. <u>Id.</u> at ¶28. CS-1 advised that, in August of 2008, pursuant to the Defendant's instructions, he or she had hidden cocaine in a doghouse on the Defendant's property, and the Defendant later instructed CS-1 to hide the cocaine inside the gas cap of a vehicle belonging to Brian Vasquez ("Vasquez"). <u>Id.</u> The Defendant also instructed CS-1 to call in a tip about the planted drugs in Vasquez's

vehicle to law enforcement, because the Defendant believed that Vasquez was distributing crack cocaine in the Defendant's area. Id. In October of 2008, the Defendant instructed CS-1 to hide two handguns in the woods, near the Defendant's residence. Id. The Defendant later instructed CS-1 to retrieve the handguns for return to the Defendant. Id. CS-1 also advised that V. May had been distributing crack cocaine from the residence of Fawn Neadeau, in Red Lake, and that, in November of 2008, CS-1 had seen the Defendant at the residence, with a re-supply of crack cocaine for V. May. Id.

On January 12, 2009, CS-2 attempted to complete a controlled purchase of crack cocaine, by contacting the Defendant on his cellular telephone. Id. at ¶30. However, the Defendant advised that "it is not butter yet," and "I'll text you n*gga when everything is butter." Id. CS-2 informed law enforcement that "butter" is a code word for finished crack cocaine. Id. On February 3, 2009, CS-2 again attempted to complete a controlled purchase of crack cocaine. Id. at ¶31. CS-2 first contacted the Defendant through an audio call to his cellular telephone, and then he or she exchanged text messages with the Defendant, in which the Defendant agreed to sell drugs to CS-2. Id. Specifically, CS-2 sent a text message to the Defendant, which stated "N*gga I got $4.00 for gas can I get 15 minutes of your time-one-." According

to CS-2, "one" means "goodbye." Id. In response, the Defendant sent a text message which read, "My bad I fell asleep Z bra. Only got the other kind of it. Cotton but its goodie [sic]." Id. CS-2 advised that "cotton" refers to cocaine. Id. Despite these communications, CS-2 did not complete the purchase, although he or she showed those text communications to law enforcement. Id.

With respect to the confidential informants, Mellor attested that CS-1 has been a confidential informant for the ATF since February 20, 2008, and his or her reliability has been established by self-incriminating statements, and the completion of controlled purchases. Id. at ¶¶32-33. In addition, law enforcement corroborated CS-1's statements through surveillance, as well as by past, successful prosecutions. Id. at ¶34. In turn, Mellor averred that CS-2 has been a confidential informant for the ATF since August 19, 2008, and his or her reliability has been established by self-incriminating statements, and past, successful investigations. Id. at ¶35. In addition, law enforcement corroborated CS-2's statements through surveillance, and the successful completion of controlled purchases, which involved the use of the Defendant's coded language. Id. at ¶36. Neither CS-1, nor CS-2, were targets of investigation, and each was helping law enforcement for monetary gain. Id. at ¶¶32, 35.

In his Affidavit, Mellor averred that a pen register had been installed on the Defendant's cellular telephone, pursuant to the Order of a Magistrate Judge from this District. Id. at ¶¶38-40. The pen register disclosed that the Defendant had used his cellular telephone for a large volume of calls, and text messages, over a short period of time, which Mellor opined was consistent with drug distribution. Id. at ¶¶38-40. Mellor also attested that drug traffickers often change telephones, and records disclosed that the Defendant had transitioned to his cellular telephone, in order to conduct his narcotics business. Id. In total, Mellor identified seven (7) individuals, including the Defendant, who were associated with the Defendant's cellular telephone, based upon a review of the Defendant's telephone records, and who would be targets of the wiretap. Id. at ¶41.

With respect to necessity, Mellor averred that law enforcement's objective was to expose the full scope of the cocaine trafficking conspiracy, including the identities of all personnel, suppliers, and customers, and the identification and location of all contraband, money, proceeds, and assets. Id. at ¶42. Based upon his experience, Mellor averred that the interception of wire and electronic communications was the only available technique with a reasonable likelihood of securing the necessary evidence, as normal investigative procedures had been, or were likely to be,

unsuccessful. Id. at ¶43. Specifically, Mellor stated that physical surveillance had limited value, given the geographical area of Red Lake, which prevented investigators from being close enough to witness any controlled purchases. Id. at ¶45. Since Red Lake is a closed community, Mellor related that the Defendant and his associates are familiar with all of their customers, and their vehicles, which meant that surveillance vehicles were easily identified. Id. In addition, Mellor averred that the residences of the Defendant, and others who were believed to be involved in the conspiracy, were not conducive to physical surveillance. Id.

As noted, Mellor reported that a pen register had been used to obtain the Defendant's telephone records, but that it could not be employed to identify the parties to any particular conversation, nor the content of the conversation. Id. at ¶48. In addition, Mellor represented, under oath, that law enforcement could not complete any undercover transactions with the Defendant, because he was highly suspicious of any strangers, as evidenced by his use of CS-2 as a broker. Id. at ¶50. Mellor specifically noted that Aalto had attempted to complete a drug transaction at the Defendant's residence, in which the Defendant ultimately confronted Aalto with a large knife, thereby forcing Aalto to identify himself as law enforcement. Id. Mellor stated that the confrontation with Aalto alerted the Defendant to the narcotics investigation,

which would render any further undercover work dangerous, particularly given the Defendant's possession of firearms.  Id.

Mellor further attested that Search Warrants were not effective in the investigation of large-scale conspiracies, because the execution of one (1) Search Warrant alerts the remaining members of the conspiracy, and results in the destruction or concealment of evidence.  Id. at ¶53.  For the same reasons, Mellor ruled out the use of Grand Jury Subpoenas to obtain the testimony of any individuals associated with the drug trafficking organization.  Id. at ¶57.  In addition, Mellor attested that a Search Warrant would not result in the seizure of a large quantity of cocaine, given the Defendant's method of widespread distribution in small amounts.  Id. at ¶52.

Mellor further averred that trash searches would have limited evidentiary value, because Red Lake did not have residential trash pick-up, which would preclude law enforcement from associating any evidence with a particular individual, and because any search would alert the targets of the investigation, given the closed community in Red Lake.  Id. at ¶58.  Although confidential informants had provided useful information to law enforcement, Mellor averred that CS-1 and CS-2 were unable to introduce an undercover agent to the Defendant's drug trafficking organization, and they were unable to provide detailed, high-level information about the conspiracy, and

its members.  Id. at ¶55.  Lastly, Mellor explained the minimization procedures which would be employed, for either voice calls or text messages.  Id. at ¶65.

On February 13, 2009, a Wiretap Order was duly issued by the District Court, the Honorable Michael J. Davis, Chief Judge, presiding.  See, Government Exhibits 3-4.  Accordingly, Mellor demonstrated, to the satisfaction of the District Court, that there was probable cause to believe that the targets of the wiretap had committed, or were committing Federal crimes, and that a wiretap was necessary to intercept both voice communications, and text messages.

At the Hearing, Mellor testified that, prior to the activation of the wiretap, the Government's counsel provided instructions, either in person or by telephone, to officers who would be monitoring the phone lines, and to the co-case agents, concerning the scope of the wiretap, its minimization requirements, and the protection of nonpertinent, or privileged communications.  The objects of discussion included the Wiretap Application and Affidavit, the Minimization Memorandum, see, Government Exhibit 5, and the District Court's Wiretap Order.  As but one example, the participants were advised about the two (2) minute minimization rule, which required that, if within the first two (2) minutes of the telephone call, the monitoring officer determined that it was a nonpertinent call, or that it involved nontargeted

individuals, then the officer would cease monitoring, and would only conduct spot checks thereafter.

In contrast, text messages were intercepted in their entirety, but were provided to a separate group of text monitoring agents for review, and the text monitoring agents were not otherwise involved in the investigation. Mellor explained that the text monitoring agents would determine whether a particular text message was pertinent or privileged, based upon their review of the Wiretap Affidavit. Only pertinent, nonprivileged text messages were forwarded to the investigation team. In turn, any nonpertinent or privileged text messages were secured in a sealed envelope, in a locked drawer, and eventually returned to the District Court for safekeeping. See, Government Exhibit 5 at p. 3, ¶7.

Once the wiretap was set up, then a copy of the Wiretap Affidavit, the District Court's Order, and the Minimization Memorandum, were posted for easy reference by the monitoring officers. The monitoring of the cellular telephone began on approximately February 14, 2009. See, Government Exhibit 6. Mellor testified that he relied upon the District Court's Order in good faith, and that he had no reason to doubt the authenticity, or the validity of the Wiretap Order. As required by the District Court's Order, every ten (10) days, law enforcement provided a report to the

District Court, which included statistics as to the number of communications intercepted, the number of those communications which were pertinent, the number of communications that were minimized, and the number of calls that were either over or under two (2) minutes. A summary of what had transpired, during the previous ten (10) days, was also provided to the District Court, and at no time did the District Court express any complaint or concern about the conduct of the wiretaps. See, Government Exhibits 6, 7, and 8. The wiretap phase of the investigation closed on March 14, 2009, just one (1) day after a Search Warrant was executed at the Defendant's residence. The telephone recordings and text message records, which were maintained on computer disks, were sealed in the presence of the District Court on March 17, 2009. See, Government Exhibits 9-10.

The minimization statistics, which were provided to the District Court, reveal that a total of 3,214 interceptions were documented, of which 1,454 were completed voice calls. Of the 164 calls lasting longer than two (2) minutes, 39 were deemed pertinent, and 71 nonpertinent calls were minimized. At most, 54 calls lasted longer than two (2) minutes, and were not pertinent, but were not minimized pursuant to procedure. See, Government Exhibits 6, 7, and 8. The minimization statistics further

disclose that 980 text messages were intercepted, of which 631 were deemed nonpertinent, by the text monitoring agents  See, <u>Government's Exhibits 7-8</u>.

      B.    <u>Facts Regarding the Search of the Defendant's Residence</u>.

At the Hearing, the Government also adduced the testimony of Ronald Walker ("Walker"), who is a Special Agent with the DEA.  Walker testified that, on March 12, 2009, he obtained a Federal Search Warrant from a Magistrate Judge in this District, which authorized a search of the Defendant's residence in Red Lake.  See, <u>Government Exhibits 11-12</u>.  The  Warrant authorized a search for records, or other items, which evidenced the transportation, ordering, purchase, and distribution of controlled substances; papers or other items that evidenced travel by the Defendant; records or other items that evidenced the acquisition, transfer, or concealment of assets, currency, or its equivalent; currency, jewelry, financial instruments, and financial ledgers; photographs or other images of the Defendant, or of any controlled substances; records or other items that evidenced occupancy, residency, or ownership of the residence by the Defendant; firearms and ammunition; sales receipts for cash purchases; drug distribution paraphernalia, including scales, plastic bags, and similar items; records or items with the names or telephone numbers of individuals involved in trafficking controlled substances; records or items that related to the sale,

repackaging, or redistribution of controlled substances; and records or items reflecting loans or repayment by any individuals involved in trafficking controlled substances, and any financial institutions. See, Government Exhibit 11.

In support of the Search Warrant, Walker submitted an Application and Affidavit which set forth the reasons that caused him to believe that evidence of criminal activity would be found in the Defendant's residence. Id., Affidavit. Walker averred that he is responsible for investigations of narcotics trafficking, including participation in the execution of Search Warrants. Id. at ¶1. In his Affidavit, Walker averred that, during the course of his investigation into the Defendant, confidential informants identified the Defendant as the leader of a drug trafficking organization, which procured narcotics in the Minneapolis area, for transfer and redistribution in Red Lake. Id. at ¶2. Walker further averred that the confidential informants assisted in the investigation by completing controlled purchases of crack cocaine from the conspirators in the drug trafficking organization, by providing the Defendant's cellular telephone number, by engaging in audio and text communications with the Defendant at that number, and by providing information about the coded language employed by the Defendant and his co-conspirators, when referring to narcotics. Id. Walker then related certain of the communications, which had been intercepted during the course

of the wiretap, and Walker attested to his belief that the Defendant, and his associates, were using coded language, during the course of those communications, in arranging for the purchase and sale of cocaine, as well as in the payment of drug debts. Id. at ¶¶4-9. According to Walker, the audio calls and text messages confirmed that the Defendant purchases narcotics from an unknown Hispanic male in the Minneapolis area, provides narcotics to his associates for sale in Red Lake, and then collects the proceeds. Id. at ¶3.

For example, during the course of one audio call, the Defendant informed an unknown male that he has more "beads" "up at [his] crib." Id. at ¶17. During another audio call, the Defendant directed an unknown male to drop off "8" with Vanessa Sagataw, the Defendant's then-girlfriend, who resided with him at the subject residence, and the unknown male advises that he will also pick up another "neezy." Id. at ¶8. Walker attested that "8" refers to drug proceeds in the amount of $800.00, while "neezy" indicated that the unknown male would pick up more narcotics to sell. Id. In addition, the Defendant's communications included other coded language, including a "hard ball," which, according to Walker, referred to a quantity of crack cocaine, a "ball of Sft [sic]," which referred to a quantity of powder cocaine, and "4

½ tamales $5500," which referred to 4.5 ounces of cocaine at a price of $5,500.00. Id. at ¶¶4-5.

Lastly, on February 26, 2009, the Defendant sent a text message to a particular telephone number, which read "What's up brotha? You alright? I herd [sic] there was a terrible accident down there. Let me know your [sic] alright." Id. at ¶7. The next day, the Defendant received an audio call from that number, and an unknown male, with a Hispanic accent, advised that he was OK, "same company, different people." Id. Walker averred to his belief that the Defendant was asking the unknown male if he had been arrested, during the course of a widely publicized DEA operation, which had resulted in the arrest of a number of individuals from a Minneapolis-area drug trafficking organization. Id.

In addition to relating the results of the wiretap investigation, Walker averred that, on March 6 and March 7, 2009, law enforcement conducted surveillance of the Defendant in Minneapolis, Minnesota, when he met with two (2) women, who were driving a red Dodge Stratus. Id. at ¶10. Shortly thereafter, the red Dodge Stratus was stopped by the Minnesota State Patrol, in Motley, Minnesota, and law enforcement found a total of nine (9) ounces of suspected cocaine in the purses of the female occupants -- Fawn Neadeau and Susan Neadeau -- who were co-Defendants in this

action.  Id.  Fawn and Susan Neadeau were arrested, and the wiretap investigation disclosed several subsequent communications, from the Defendant's cellular telephone, to Susan Neadeau's cellular telephone.  Id.  In fact, Walker disclosed that, on March 8, 2009, the Defendant used his cellular telephone to leave a voice message for Susan Neadeau, in which he threatened her with physical violence, if she "ain't got [his] f*ckin [sic] clothes," and if she "don't [sic] get [his] sh*t back to [him] by tomorrow * * * ."  Id. at ¶11.  Walker expressed the belief, based upon his training and experience, as well as his knowledge of the investigation, that the Defendant was referring to the cocaine which had been seized during the arrests of Fawn and Susan Neadeau.  Id.

With respect to the use of confidential informants, Walker identified one (1) confidential informant as CI-378, and he attested that CI-378 had provided information which identified the Defendant as a drug dealer.  Id. at ¶12.  In addition, Walker represented that, during the course of the wiretap, law enforcement intercepted a communication, in which CI-378 called the Defendant in order to purchase narcotics, immediately after law enforcement had provided CI-378 with $100.00 in subsistence money.  Id.  According to Walker, CI-378 failed to report that communication to law enforcement.  Id.  In addition, Walker attested that, a few days

prior to that incident, CI-378 had contacted his handling agent, and admitted to the recent use of crack cocaine. Id.

Walker identified another confidential informant as CI-407, and Walker averred that CI-407 had personally observed the Defendant with drugs, and that CI407 had conducted controlled purchases of crack cocaine from, and through, the Defendant. Id. at ¶13. In addition, Walker attested that CI-407 had observed the Defendant wearing a bullet-proof vest. Id. According to Walker, on January 29, 2009, CI-407 observed the Defendant, in the yard of his residence, with several firearms, including a Desert Eagle pistol, an AR-15 rifle, a camo shotgun, and a Tech-9 folding firearm, and the Defendant stated that he was "trying to get rid of the firearms in case the 'feds' come." Id. Walker averred that CI-407 also engaged in drug sales, with certain of the Defendant's associates, despite law enforcement's instructions not to engage in such practices. Id. at ¶14.

According to Walker, the Defendant has a history of involvement in narcotics trafficking. Specifically, Walker attested that the Defendant was convicted of possessing crack cocaine, with intent to distribute, for which he was sentenced to thirty-seven (37) months of incarceration in a Federal prison. Id. at ¶16. Based upon that felony conviction, Walker averred that the Defendant is prohibited from

possessing any firearms. Id. In addition, Walker averred that, on November 11, 2007, Aalto interviewed Terry May ("T. May") and, during the course of that interview, T. May identified the Defendant as a cocaine distributor. Id. at ¶15.

T. May admitted to purchasing both crack and powder cocaine from the Defendant in the past, for which he still owed the Defendant a total of $600.00, and T. May informed Aalto that he would be able to purchase additional cocaine from the Defendant, so long as he paid his outstanding balance in full. Id. Accordingly, T. May agreed to introduce Aalto to the Defendant, in order to complete a controlled undercover purchase of cocaine. Id. T. May was provided with $950.00, in order to pay his outstanding drug debt, and then he accompanied Aalto to the Defendant's residence. Id. However, upon their arrival, T. May walked around the Defendant's residence, and then ran into the woods, with the money, and without notice to Aalto. Id. At that point, the Defendant exited the residence, and threatened Aalto with a large buck knife, based upon his erroneous belief that Aalto intended to rob him, and in an effort to protect his residence. Id. at ¶¶15, 17. Although the Defendant was briefly detained, he was not arrested, and he contacted law enforcement, on the following day, to offer his assistance in locating T. May. Id. at ¶15.

Based upon the foregoing facts, Walker expressed his belief that contraband, evidence, fruits, and instrumentalities, relating to criminal violations involving the ongoing sale of narcotics, and involving the unlawful possession of firearms and ammunition, would be found at the Defendant's residence. Id. at ¶ 17. Walker further attested that he had identified the Defendant's residence, based upon Aalto's encounter with the Defendant on November 11, 2007, and with the assistance of Tim Ball ("Ball"), who is a Special Agent with the FBI, and who advised Walker that between 2002 and 2007, he had three (3) encounters with the Defendant at the subject residence. Id.

As noted, on March 12, 2009, a Magistrate Judge issued the Search Warrant, and at the Hearing, Walker testified that he promptly faxed the Search Warrant to Mellor. In his testimony, Mellor confirmed that he received the Search Warrant via fax, and that he participated in the execution of the Search Warrant at the Defendant's residence. According to Mellor, the Defendant cooperated with law enforcement, and assured them that his family would not be present during the search. Mellor further testified that he and other agents entered the residence through a rear door, in order to secure the premises for purposes of officer safety, prior to conducting the search. At the time of the search, Mellor provided the Defendant with a copy of the Search

Warrant and, at the conclusion of the search, Mellor completed and reviewed the inventory of seized items with the Defendant.  See, Government Exhibit 13.

In support of his Motion to Suppress, the Defendant asks us to review the Search Warrant upon its "four corners," in order to determine whether it was supported by probable cause, or contained any other constitutional defects.  We first turn to consider the Defendant's Motion to Suppress Evidence obtained from the wiretap investigation, and then proceed to the Search Warrant issues.

III.  Discussion

A.     The Defendant's Motion to Suppress Evidence Obtained
       from the Wiretap.

In his Motion, the Defendant asserts that the Wiretap Order was not supported by sufficient probable cause, and he further argues that the Government failed to employ adequate minimization procedures, or to establish the necessity of a wiretap.  See, Docket No. 84.

As a threshold matter, our independent review satisfies us that the wiretap was supported by probable cause.  In this respect, the Defendant specifically argues that "numerous people could have had access to his cell phone and used it to text incriminating messages for which [he] had no knowledge."  Id.  However, in

determining the existence of probable cause for the allowance of electronic interception, the supporting Affidavit must include "facts that would allow the issuing judge to believe (1) that an individual had committed or was about to commit a particular offense, (2) that communication relating to that offense would be intercepted, and (3) that the evidence was being used in connection with that offense or was commonly used by those whose communications were to be intercepted." United States v. Milton, 153 F.3d 891, 894 (8th Cir. 1998), cert. denied, 525 U.S. 1165 (1999); see also, United States v. Voraveth, 2008 WL 4287293 at *9 (D. Minn., July 1, 2008), adopted, 2008 WL 4287323 (D. Minn., September 16, 2008)("An application to engage in electronic surveillance must be reviewed in a practical and common sense fashion and broad discretion must be accorded to the decision to authorize a wiretap."), citing United States v. Garcia, 785 F.2d 214, 221 (8th Cir. 1986), cert. denied, 475 U.S. 1143 (1986).

Unquestionably, Mellor's Affidavit in support of the wiretap adequately supplied salient support for a finding of probable cause, given the detailed description of a number of controlled purchases, which were arranged through the use of coded language in voice calls, and text messages, to the Defendant's cellular telephone. Accordingly, Mellor's Affidavit amply demonstrated that the wiretap would be

reasonably expected to yield evidence concerning the distribution of narcotics, by the Defendant and others. Compare, <u>United States v. Almada-Cota</u>, 2007 WL 4372965 at *10 (D. Minn., December 6, 2007)(rejecting a similar challenge in which the "defendant only generally asserts, in wholly conclusory fashion, that the affidavit contains insufficient probable cause evidence," while providing "no particularized argument whatsoever with respect to the nature of any alleged deficiency in probable cause"). Of course, we do not say, as the evidence is not before us, and further, because that is not our function, that the wiretap evidence implicates the Defendant in crime. We merely find, and the question is not a close one, that Mellor's Affidavit provided ample probable cause for a wiretap.

As for the need to conduct a wiretap, Mellor's Affidavit inventories the types of investigatory tools which had been used or considered, and the reasons why they had proven less than successful, or why such procedures were unlikely to succeed, in meeting the objectives of the investigation. "The necessity requirement of §2518 insures '"that wiretaps are not routinely employed as the initial step in an investigation."'" <u>United States v. Jackson</u>, 345 F.3d 638, 644 (8th Cir. 2003), quoting <u>United States v. Thompson</u>, 210 F.3d 855, 858-859 (8th Cir. 2000), cert. denied, 532 U.S. 996 (2000), quoting, in turn, <u>United States v. Maxwell</u>, 25 F.3d 1389, 1394 (8th

Cir. 1994), cert. denied, 513 U.S. 1031 (1994). "The intent of the requirement is 'to restrict wiretaps to those which are necessary as well as reasonable.'" United States v. Abdul-Ahad, 2008 WL 5071073 at *11 (D. Minn., November 14, 2008), quoting United States v. Daly, 535 F.2d 434, 438 (8th Cir. 1976).

Based upon our close review of the Affidavit, we find Mellor's explanation of the need for a wiretap to be "full and complete," see, Title 18 U.S.C. §2518(1)(c), as well as convincing, that a wiretap could effectively uncover evidence that the other investigative tools had failed to disclose. See also, United States v. Jackson, supra at 644 ("If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied."). Of course, the necessity requirement does not "require that law enforcement officers 'exhaust all possible techniques before applying for a wiretap.'" United States v. Thompson, supra at 859, quoting United States v. Shaw, 94 F.3d 438, 441 (8th Cir. 1996), cert. denied, 519 U.S. 1100 (1997), quoting, in turn, United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991).

Although the Defendant contends that law enforcement should have used surveillance, or hidden a recording device on a confidential informant, we conclude

that Mellor's Affidavit amply demonstrated that those methods of investigation had not been, or would not be successful, in revealing the full scope of any conspiracy, or the identities of its members. Mellor specifically attested to the successes and limitations of numerous investigative techniques, which had been employed by law enforcement, and he further explained why several other techniques, including the use of undercover agents, and confidential informants, would not be effective, under the circumstances of this case. Accordingly, we find that the necessity for the wiretap was properly established, as had previously been found by the authorizing District Court Judge.

Moreover, we find no evidence that the wiretap was abused in any way, and the Defendant has not drawn any such abuse to our attention. Although the Defendant asserts that a number of innocent, nonpertinent telephone calls were intercepted, "[w]hether wiretap monitors adequately minimize non-pertinent [communications] is a question of objective reasonableness." United States v. Abdul-Ahad, supra at *12, citing United States v. Macklin, supra at 1328. Despite the Defendant's conclusory assertion of abuse, "[o]ccasional interception of nonpertinent communications is not forbidden by 18 U.S.C. §2518(5) and does not warrant suppression * * * ." United States v. Voraveth, supra at *12, citing United States v. Padilla-Pena, 129 F.3d 457,

464 (8th Cir. 1997), cert. denied, 524 U.S. 905 (1998). Indeed, "[i]n a case involving a wide-ranging conspiracy with many participants, even an experienced monitor might experience difficulties in determining the relevancy of uncompleted calls." Id.

On the Record presented, we find no basis to justify suppression, owing to a failure to minimize. As noted by the Government, law enforcement employed the two (2) minute minimization procedure, which has been "reviewed favorably" by our Court of Appeals on a number of occasions. See, United States v. Ozar, 50 F.3d 1440, 1448 (8th Cir. 1995), cert. denied, 516 U.S. 871 (1995); see also, United States v. Tinnin, 2008 WL 1786991 at *15 (D. Minn., April 17, 2008)(collecting cases). Moreover, we explicitly find that the Government's procedure for minimizing text messages was objectively reasonable. The monitoring agents employed appropriate methods for minimization, but "[m]inimization, by definition, is not an exact endeavor." United States v. Voraveth, supra at *12.

Lastly, we are satisfied that the wiretap was authorized, and conducted, in good faith. Therefore, even if we were persuaded that some other technical flaw might otherwise question the validity of the wiretap, we would be obligated to find that law enforcement relied upon the Wiretap Order in good faith. See, United States v. Moore, 41 F.3d 370, 376 (8th Cir. 1994), cert. denied, 514 U.S. 1121 (1995)

(concluding that "good faith" doctrine, first espoused in <u>United States v. Leon</u>, supra, applies to electronic surveillance suppression issues).  Accordingly, we recommend that the Defendant's Motion to Suppress the Wiretap Evidence be denied.

        B.     <u>The Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure</u>.

        1.     <u>Standard of Review</u>. In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband.  See, <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); <u>United States v. Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996).  In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular, designated place.  See, <u>United States v. Gladney</u>, 48 F.3d 309, 313 (8th Cir. 1995); <u>United States v. Tagbering</u>, 985 F.2d 946, 949 (8th Cir. 1993).  For these purposes, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal

rules." Illinois v. Gates, 462 U.S. 213, 232 (1983); see also, Ornelas v. United States, 517 U.S. 690, 695 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'" United States v. Ryan, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting United States v. Goodman, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999). In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis. See, United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991); Technical Ordnance, Inc. v. United States, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002). Moreover, the reviewing Court must not engage in a de novo review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant. See, United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991). This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. See, Illinois v. Gates, supra at 236.

2.    <u>Legal Analysis</u>.  Our review of the Search Warrant for the House, and its underlying application, confirms the appraisal of the issuing Judicial Officer, that ample probable cause supported the issuance of the Warrant, and further, that the Warrant was not otherwise fatally defective.

We recognize that some of the information, which is contained in the Affidavit, was supplied by the confidential informants who worked with Mellor, Walker, and the other investigating officers.  At the Hearing, the Defendant specifically argued that Walker's Affidavit failed to demonstrate the reliability of those informants and, when probable cause for a Search Warrant is based on information provided by an informant, "'a key issue is whether that information is reliable.'"  <u>United States v. Koons</u>, 300 F.3d 985, 993 (8th Cir. 2002), quoting <u>United States v. Fulgham</u>, 143 F.3d 399, 401 (8th Cir. 1998); see also, <u>United States v. Reivich</u>, 793 F.2d 957, 959 (8th Cir. 1986)("[T]he informant's reliability, veracity, and basis of knowledge are relevant considerations -- but not independent, essential elements -- in finding probable cause.").  As our Court of Appeals has stated:

> In [Illinois v.] Gates, the Supreme Court explained that an informant's reliability and basis of knowledge "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations:  a deficiency in one may be

> compensated for, in determining the overall reliability of a
> tip, by a strong showing as to the other, or by some other
> indicia of reliability." * * * 462 U.S. at 233, 103 S.Ct. at
> 2329.

United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1995).

As a result, "'an informant's basis of knowledge [is] an important consideration, but

not a rigid requirement, in the probable cause determination.'" Id., citing United

States v. Anderson, supra at 615.

Consequently, the "core question" is whether the information, which was

provided by the informant, was reliable. See, United States v. Williams, 10 F.3d 590,

593 (8th Cir. 1993)("The core question in assessing probable cause based upon

information supplied by an informant is whether the information is reliable.").

Moreover, "[t]he statements of a reliable confidential informant are themselves

sufficient to support probable cause." United States v. Wright, 145 F.3d 972, 975 (8th

Cir. 1998). In turn, an informant is deemed reliable when his statements are

corroborated by independent evidence. See, United States v. Carpenter, 341 F.3d 666,

669 (8th Cir. 2003) ("[C]orroboration of minor, innocent details may support finding

of probable cause."), citing United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir.

2001); see also, United States v. Koons, supra at 993 ("'Information may be

sufficiently reliable to support a probable cause finding if the person providing the

- 33 -

information has a track record of supplying reliable information, or if it is corroborated by independent evidence.'"), quoting United States v. Fulgham, supra at 401; United States v. Formaro, 152 F.3d 768, 770 (8th Cir. 1998)("[C]orroboration of the confidential informant's information by independent investigation is an important factor in the calculus of probable cause.").

Here, we find that Walker reasonably relied upon the information provided by the confidential informants, because those informants were known to law enforcement, see, United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005), quoting Florida v. J.L., 529 U.S. 266, 270 (2000)("[A] known informant * * * can be held responsible if her allegations turn out to be fabricated."), and because the information was corroborated by law enforcement. See, United States v. Rivera, 410 F.3d 998, 1002 (8th Cir. 2005)(informant's credibility was established where his representations were corroborated by officer surveillance, and the recovery of narcotics from the informant following a controlled drug transaction); United States v. Smith, 266 F.3d 902, 905 (8th Cir. 2001)(finding that an Affidavit which detailed an officer's surveillance of controlled drug transactions provided probable cause to support a Search Warrant).

In addition, we conclude that Walker reasonably relied on the statements made by CI-407, who, through his or her statements, acted against his or her own penal interests, by implicating him- or herself in the drug-dealing activities of the Defendant. See, United States v. Allen, 297 F.3d 790, 794-95 (8th Cir. 2002) ("[E]ven though [the informant] had no record as an informant, the information he provided was sufficiently credible both because his statements were against his penal interest and because the police were able to corroborate some of the information he provided."), citing United States v. Tyler, supra at 1039.

Moreover, the vast majority of the information in Walker's Affidavit was drawn from other sources -- namely, surveillance of the Defendant, and the interception of his communications. Unlike some Applications for a Search Warrant, where the critical determinant is the reliability of a confidential informant, here the confidences of the informants were woven into a much larger showing of probable cause and, as in United States v. Williams, supra at 594, the information provided by the informants "was based on the informant[s'] firsthand observations, not merely from rumor or innuendo."

As such, we concur with the implicit determination of the issuing Judicial Officer, that probable cause was present to believe that the Defendant was engaged

in ongoing narcotics trafficking, over a period of approximately thirty (30) days, and within only a few days of the issuance of the Search Warrant. In addition, it is undisputed that law enforcement had established a nexus between the Defendant and his residence, given the undisputed evidence that the Defendant lived at the subject residence, in Red Lake. Indeed, Walker detailed numerous encounters, between law enforcement and the Defendant, at the Defendant's residence, over the course of several years.

Our Court of Appeals has repeatedly recognized that "information in the affidavit showing that [the defendant] engaged in a continuing course of drug trafficking * * * along with [the Affiant's] averment based upon his experience that drug traffickers often keep in their residences records of their elicit activity, large amounts of cash, assets purchased with the proceeds of drug transactions, and guns to protect their guns and cash, provided the issuing judge with a substantial basis for finding probable cause to search [the defendant's] residence." United States v. Luloff, 15 F.3d 763, 768 (8th Cir. 1994); see, United States v. Walker, 324 F.3d 1032, 1038 (8th Cir. 2003); United States v. Premises Known as 6040 Wentworth Ave. South Mpls., 1996 WL 260745 at * 4 (D. Minn. 1996), aff'd, 123 F.3d 685 (8th Cir. 1997); see also, United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993). Although

Walker does not specifically aver, in his Affidavit, that he knows that drug traffickers keep such evidence in their homes and vehicles, he does attest to his experience and training in narcotics investigations. Considering the totality of the circumstances, we find that Walker's Affidavit provided probable cause to believe that evidence of criminal activity would be uncovered at the Defendant's residence. We also find that the information in the Affidavit was not impermissibly stale, at the time that the Search Warrant was issued. "It is axiomatic that probable cause must exist at the time of the search and not merely at sometime earlier." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005), citing United States v. Formaro, supra at 771; see, United States v. Ozar, supra at 1446. Therefore, a lapse of time, between the observations of a witness and the issuance of a Search Warrant, like a delay in executing a Search Warrant, "may make probable cause fatally stale." United States v. Maxim, supra at 397 [quotations omitted].

"There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry. Id., quoting United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993); United States v. Rugh, 968 F.2d 750, 754 (8th Cir.

1992); see also, <u>United States v. Kennedy</u>, supra at 1141; <u>United States v. Chrobak</u>, 289 F.3d 1043, 1046 (8th Cir. 2002).  As but one example, when the Affidavit alleges an "ongoing continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause." <u>United States v. Rugh</u>, supra at 754.

Therefore, in our analysis, we must not "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but must consider any passage of time "in the context of a specific case and the nature of the crime under investigation." <u>United States v. Maxim</u>, supra at 397, quoting <u>United States v. Koelling</u>, supra at 822.  As our Court of Appeals has explained, "[i]n investigations of ongoing narcotic operations, 'intervals of weeks or months * * * [do] not necessarily make the information stale.'" <u>United States v. Smith</u>, supra at 905, quoting <u>United States v. Formaro</u>, supra at 771; see also, <u>United States v. LaMorie</u>, 100 F.3d 547, 554 (8th Cir. 1996)("Where continuing criminal activity is suspected, the passage of time is less significant.").  "'[W]here recent information corroborates otherwise stale information, probable cause may be found.'"  <u>United States v. Ozar</u>, supra at 1446, quoting <u>United States v. Macklin</u>, supra at 1326; see also, <u>United States</u>

v. Tyler, supra at 1039 (finding that Affidavit which referenced controlled purchases occurring "within the last seven months" was not unduly stale).

Here, we find that the information contained in the Affidavit had not become impermissibly stale by the time the Search Warrant was issued, and executed. As noted, Walker averred that law enforcement had several interactions with the Defendant at his residence, dating to 2002, and that, in 2007, Aalto attempted to arrange a controlled purchase from the Defendant, through T. May, who ultimately absconded with Government funds. Not only did that information relate to an ongoing narcotics investigation, but it had been "freshened" with more current information, which had occurred within the previous week, including the Defendant's continuing drug trafficking activity, as evidenced by his intercepted communications, within days of the application for, and issuance of, the Warrant. See, United States v. Ozar, supra at 1446 ("'[W]here recent information corroborates otherwise stale information, probable cause may be found.'"), quoting United States v. Macklin, supra at 1326; see also, United States v. Morrow, 2004 WL 385278 at *1 (8th Cir., March 2, 2004)("The seven-day delay did not render stale the information on which the Warrant was based."), citing United States v. Gibson, 123 F.3d 1121, 1124-25 (8th Cir. 1997)(four-day delay did not render the Warrant stale where drug activity was ongoing).

Therefore, we find nothing stale about the information upon which probable cause was predicated, and we reject the Defendant's argument that the Search Warrant, for his residence, was defective on probable cause grounds.[3] Further, our independent review of the Warrant, and its supporting papers, has disclosed no fatal constitutional flaw which would commend suppression. Accordingly, we recommend that the Defendant's Motion to Suppress be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendant's Motion to Suppress Evidence Obtained from a Wiretap [Docket No. 84] be denied.

2.     That the Defendant's Motion to Suppress Evidence Obtained from Search and Seizure [Docket No. 85] be denied.

---

[3]Even if the information in the Search Warrant had been insufficient to establish probable cause, or was impermissibly stale, we would be compelled, by the law of this Circuit, to find that the officers' reliance upon the Search Warrant was reasonable, because the Warrant was "not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999), citing United States v. Leon, 468 U.S. 897, 922-23 (1984). Indeed, at the Hearing, Mellor testified that he relied upon the Search Warrant in good faith, and that he had no reason to doubt its authenticity, or validity.

Dated:  June 16, 2009                    s/Raymond L. Erickson
                                         Raymond L. Erickson
                                         CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than July 6, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than July 6, 2009**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.